# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ROBERT J. MARX,

      Plaintiff,

v.

RICHLAND COUNTY, WI,

      Defendant.

OPINION and ORDER

Case No. 15-cv-764-wmc

---

Plaintiff Robert J. Marx is a disabled veteran who suffers from Post Traumatic Stress Disorder ("PTSD"). His lawsuit was previously screened to go forward against Richland County under the Americans with Disabilities Act ("ADA") and Rehabilitation Act related to his failed attempt to obtain veterans benefits through Richland County's Veterans Service Office ("RCVSO"). (Dkt. #19.) Marx specifically claims that the RCVSO officer Karen Knock discriminated against him in violation of both Acts by refusing to provide him with benefits because he would not meet with her in person. Now before the court is defendant's motion for summary judgment. (Dkt. #20.) As the undisputed evidence of record does not support a finding that Marx has been denied benefits because of his PTSD, defendant's motion will be granted and judgment entered in its favor.[1]

---

[1] Marx has also filed a motion for reconsideration of the court's screening order dismissing Karen Knock as a defendant in this action. While Marx claims that Knock stood in the way of his receipt of benefits from the RCVSO and violated state law, he did not explain why Knock is a proper defendant to an ADA/Rehabilitation Act claims, he does not offer any new or different facts than in his original complaint, nor does he cite to any Wisconsin law suggesting that he has a cause of action against her individually. Accordingly, that motion will be denied because he identified no error of law or fact warranting reconsideration.

## I.    Background

The U.S. Department of Veterans Affairs ("VA") has concluded that Marx's PTSD has rendered him completely disabled.  Marx suffers from numerous symptoms related to his PTSD that limit his ability to participate in society, including anxiety, trouble concentrating, paranoia, sweating, shaking, vomiting, suicidal thoughts, and angry, emotional outbursts.  These symptoms are easily triggered by a variety of environmental factors, including loud noises, interacting with other people (who he testified to hating generally), and reading news articles.

According to Marx's wife, Olena Marx, PTSD does not prohibit Marx from leaving his home *completely*, but his PTSD does prevent him from leaving when his symptoms are severe. (Olena Marx Aff. (dkt. #35) ¶¶ 9-10.)  As a result, Marx and his family live a very isolated life. Marx testified that when he does leave the house he is accompanied by Olena.

---

[2]  The court has drawn the following material facts from the parties' proposed findings of fact, responses and supporting evidence.  While neither party specifically ripened any issue by way of formal motion, there has been some back and forth in their briefing regarding events that took place during Robert Marx's deposition, taken on January 11, 2018.  (*See* Marx. Dep. (dkt. #28).)  Without explicitly claiming that defendant's counsel violated any rules of procedure or ethics, Marx complains he sat literally "bleeding through a painful deposition in response to the defendant's unwavering demand that Marx answer questions in-person."  (Pl. Opp. Br. (dkt. #31) at 10.)  Out of deference to Marx's *pro se* status and apparently vulnerable mental state, the court reviewed the entirety of the deposition transcript, even though only portions of his testimony are relevant to Marx's claim in this lawsuit.  Nothing in that transcript suggests defendant's counsel acted inappropriately.  Indeed, while the transcript confirms that Marx's nose *was* bleeding during the deposition, counsel asked him whether he could proceed and Marx assured him that he could.  (Marx Dep. (dkt. #28) at 6-9.)  Furthermore, throughout the deposition, defendant's counsel seemed neither argumentative nor confrontational, and he made efforts to accommodate Marx when possible.  While Marx complains that he had to sit for the deposition for two hours, this length of time is obviously well within the seven-hour default allotment permitted under Federal Rule of Civil Procedure 30(d)(1), and the court has not identified any line of questioning during the deposition suggesting that counsel was attempted to draw out the deposition in an effort to harass or intimidate Marx.

## II.  Marx's interactions with the RCVSO

On February 6, 2015, Marx, Olena and their 19-month-old daughter attempted to appear for an in-person meeting with an RCVSO officer, but because of an anxiety attack Marx could not complete that meeting.  Instead, Marx got very uncomfortable when he was asked to sit down because the chair faced away from the doorway.  At that point, Marx and his family left without arranging for the RCVSO to provide him with benefits.  As a result, it appears that no one at the RCVSO took any action to obtain benefits for Marx from February 6, 2015, until shortly after Karen Knock started as the Veterans Service Officer in May of 2015.

On May 22, 2015, Knock called Marx to follow up regarding his benefits, leaving him a long telephone message, explaining that she was new to the office and wanted to help him with his benefits.  At multiple points during her recorded message, Knock explained that she was "there for [him]" and that he was welcome to stop by the office at his convenience.  Knock did not offer to visit his house, but Marx does not dispute that her statements were non-confrontational. Unfortunately, neither Robert nor Olena Marx returned Knock's phone call or responded in any other fashion.

On July 15, Marx did send a lengthy email to a number of Richland County representatives and employees, complaining about a variety of issues unrelated to his attempt to obtain benefits from the RCVSO.  Of relevance, Marx described his military service in that email, reporting that despite suffering from PTSD, he has been unable to receive veterans benefits.  Marx also noted that the suicide rate among veterans was 20 per day.  While Marx did not send a copy to Knock, or refer to her in his email, he ended it with a request that the recipients forward his letter to the Richland County Sheriff and RCVSO because he did not have contact information for those entities.

The email was apparently forwarded to Knock that day, because she promptly responded with an email to Marx.  In her July 15 email, she wrote:

> I am available to you on a daily basis.  However, I will be out of the office from 19July2015 to 30July.  I have reached out to you, left you my phone numbers, we have our own facebook page, we have our own page on the government web site, or you can google and find my contact information in about 65 places.
>
> I do not judge you on anything that may have happened in the past in this office, however you not calling me back after 4 weeks gave me the message that you didn't want my help.
>
> I say again, I am here to help and I want to help.  You may want to recheck you[r] stats, 22 veterans a day commit suicide.  I am here to make sure that doesn't happen on my watch.
>
> I say again, walk ins are welcome or you can make an appointment.

(Def.'s Ex. 2 (dkt. #24-2) at 2-3.)

Marx immediately emailed Knock back as well.  In his July 15 responsive email, he criticized Knock's email, particularly taking issue with her comments about the veteran suicide statistic and the availability of her contact information.  Marx also asked Knock whether she had training related to PTSD, and he expressed doubt that she could help him in any way beyond working with the county to help him with his rights.  Knock replied yet again on the 15th, writing that she had all the information she needed about Marx, but still needed to see him in person.  Knock again offered Marx the choice of either making an appointment or walking into the RCVSO, but she did add that "you have to be in front of me in person."  (Def.'s Ex. 2 (dkt. #24-2).)  Marx did not respond to that email, nor to any of Knock's subsequent communications (much less respond specifically to her request to see him in person).  In fact, Knock emailed him three more times to provide him with additional information she thought might be of interest to him.  On August 4, 2015, Knock even sent both Robert and Olena Marx an email offering to send

them some items via email since they still had not come into the office.  On August 25, 2015, Knock sent Marx yet another email providing him with information about a presentation for veterans.  Finally, on September 30, 2015, Knock sent Marx another email with information from the National Center for PTSD.

### III.    RCVCO's in-person meeting policy

In her affidavit, Knock explains that the RCVSO requires an in-person visit with veterans to initiate a benefits application to maintain the confidentiality of veterans' information, which includes complying with HIPAA.  This policy is not in writing; rather, it is a practice that Knock adopted to address her concern with maintaining veterans' confidentiality.  Without contradiction, Knock further explains that she carries out this practice for *all* veterans, and therefore, she did not treat Marx any differently than other veterans she assists.

Marx claims that the Wisconsin Department of Veterans Affairs does not require a photo identification for a veteran to apply for Wisconsin G.I. Bill education benefits, and also claims that other veterans offices have not required him to appear in person to begin receiving benefits, but provides no details about how he initiated the benefits process in either of these programs. Marx further acknowledges that Knock offered to come to his house for the in-person meeting, but maintains that she offered no other type of accommodation for his PTSD.  While Marx also testified during his deposition that he was not opposed to people coming to his home, his wife's affidavit represents that he was actually very opposed to people coming to his home.  (*Id.* ¶¶ 3-7.)

## IV.    Marx's civil rights complaint

On July 20, 2015, Marx filed a discrimination complaint with the United States Department of Justice -- Civil Rights Division about the RCVSO.  After hearing nothing about his complaint for almost four months, Marx emailed Tom Crofton, a Richland County supervisor, for an update.  In that November 19, 2015, email, Marx explained that he had been directed to Knock's office to obtain information related to veterans benefits, but that he was unable to complete an in-person meeting due to the risk of "significant physical and emotional trauma," and he asked for a copy of the in-person meeting policy.  On November 20, 2015, Supervisor Crofton forwarded Marx's email to Knock.  In her November 20, 2015, response to Crofton, Knock wrote that she had offered to visit Marx's home, but received no response from Marx.  While Crofton responded that he would relay that message to Marx, Knock never heard from Marx.  Marx claims no one relayed Knock's offer, and he only learned that a home visit was possible in 2016.

Specifically, on May 19, 2016, Marx received a letter from the VA related to his civil rights complaint.  Karen Civitate, a resolution support specialist for the VA, acknowledged her office's receipt of Marx's complaint on April 5, 2016, but informed him that her office does not handle complaints involving the County Veteran Service Office because they are not funded by the VA.  Specialist Civitate further wrote that she spoke with Knock about Marx's allegations, that Knock reported offering to visit Marx's home, and that she would still need to meet with him face-to-face.  Marx also claims that until he received Civitate's April 2016 letter he had not been informed in writing about this in-person meeting requirement.

## V. RCVSO funding sources

According to Knock, the RCVSO receives no federal funding of any kind. According to Marx, it did receive funding from the federal government, at least in 2015 when he first contacted that office about receiving benefits. In particular, Marx maintains that the office received an $8,500 grant from the State of Wisconsin Department of Veterans Affairs. Marx explains that the funds for this grant were drawn from the Wisconsin Department of Veterans Affairs Veterans Trust Fund, as well as the Wisconsin Veterans Home in King, Wisconsin. Marx further avers that the Wisconsin Veterans Home receives federal grants, veterans disability income and Medicare reimbursements.

## OPINION

Plaintiff is proceeding against Richland County on a claim that his interaction with Knock violated his rights under the ADA and/or Rehabilitation Act. As explained when the court screened plaintiff's complaint, the ADA prohibits discrimination against qualified persons with disabilities. 42 U.S.C. §§ 12131-12134. To establish a violation of Title II of the ADA, a plaintiff "must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (*citing Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (citing 42 U.S.C. § 12132)). Similarly, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.

§ 794(a).  A claim under § 504 of that Act has four elements: (1) an individual with a disability; (2) who was otherwise qualified to participate; (3) but who was denied access solely by reason of disability; (4) in a program or activity receiving federal financial assistance.  *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).  Defendant seeks entry of summary judgment because (1) plaintiff cannot prove discrimination and (2) Richland County does not received federal financial assistance of any kind.[3]

## I.  Discrimination

Under the ADA and Rehabilitation Acts, disability discrimination can be established in three ways:  "(1) the defendant intentionally acted on the basis of the disability; (2) the defendant refused to provide a reasonable accommodation, or (3) the defendant's rule disproportionally impacts disabled people."  *A.H. by Holzmueller v. Illinois High Sch. Assoc.*, 881 F.3d 587, 593 (7th Cir. 2018) (quoting *Washington v. Ind. High Sch. Athletic Assoc., Inc.*, 181 F.3d 840, 847 (7th Cir. 1999)).  Because plaintiff argues in opposition to defendant's motion for summary judgment that he has suffered each type of discrimination, the court will address each in turn.

### A.  Discrimination

---

[3]  Formally, defendant requested judgment only as to the Rehabilitation Act claim, but plainly seeks judgment in full, even though the court granted plaintiff leave to proceed on his claim under both the ADA and Rehabilitation Act claim.  Perhaps this was an oversight or a misinterpretation of the court's screening order.  Regardless, summary judgment in defendant's favor under both Acts is warranted.  Typically in these circumstances, the court would provide a plaintiff a further opportunity with respect to an additional claim under Federal Rule of Civil Procedure 56(f).  That step is unnecessary here since all elements of an ADA claim and the first three elements of a Rehabilitation Act claim are analyzed the same way, *see A.H. by Holzmueller v. Illinois High Sch. Assoc.*, 881 F.3d 587, 593 (7th Cir. 2018), and plaintiff has already had the opportunity to respond to the merits of defendant's arguments.  As set forth in the discussion that follows, any further response related to plaintiff's ADA claim would, therefore, be wholly duplicative.

First, plaintiff contends that Knock's justification for meeting him in person was mere pretext for an intent to discriminate against him on the basis of his PTSD. This argument alludes to the indirect method of proving discrimination, in which plaintiff must first establish a *prima facie* case of discrimination, and then the burden shifts to the defendant to present evidence showing a legitimate, nondiscriminatory reason for policy. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014).[4] If the defendant meets its burden, then plaintiff must submit evidence that the City's stated reason is pretextual. *Id.* at 683 (explaining that plaintiff must "prove by a preponderance of the evidence" that the stated justification is a lie).

Here, plaintiff does not support his pretext theory with *any* evidence that Knock wanted to do anything other than verify his identity during an in-person meeting. Instead, he points to his prior experience, arguing that he has been able to obtain benefits from other VSO's without having to appear for an in-person meeting. Even accepting that plaintiff should not have been required to meet in-person given the restrictions of his PTSD in order to obtain benefits from the RCVSO, this would not permit a reasonable jury to infer that Knock's justification for the in-person meeting requirement was disingenuous or pretextual. Indeed, the only evidence of record is that Knock made a legitimate offer to address Marx's request for benefits. Accordingly, plaintiff's pretext argument fails.

### B.    Reasonable accommodation

Next, while plaintiff does not explicitly state that he pursued a "reasonable accommodation," he references Knock's apparent refusal to excuse him from the in-person

---

[4] The Seventh Circuit has recently encouraged collapsing the direct and indirect methods of proving discrimination. *Monroe v. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). However, on the facts here, the result is the same as explained above.

meeting. Generally, however, a plaintiff must first request a reasonable accommodation to trigger a defendant's obligation to provide a reasonable accommodation. *Guzman v. Brown County*, 884 F.3d 633, 642 (7th Cir. 2018) (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000)). There are exceptions to this general rule. For example, circumstances in which an individual suffers from a mental impairment that hinders the communication process may oblige the employer or the entity providing the service to meet such an individual halfway. *Jovanovic*, 201 F.3d at 899. Ultimately, both parties have an obligation to engage in a good faith interactive process to determine a reasonable accommodation. *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). When a request is made, what constitutes a reasonable accommodation is limited by what the parties actually know about the disability. *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir. 1997).

There are two principal problems with plaintiff's claim that Knock refused to accommodate his request for an exception to the in-person meeting requirement. First, plaintiff has submitted no evidence allowing a reasonable trier of fact to find that Marx (or his wife) actually requested to circumvent the in-person meeting to accommodate his PTSD. In fact, there is no evidence that Knock or any other RCVSO employee actually knew that plaintiff's PTSD hindered his appearing in-person. While plaintiff could reasonably argue that the RCVCO should affirmatively anticipate such a hindrance for those with PTSD or similar psychological conditions impairing social interactions, PTSD is not obviously so debilitating, as would be, for example, a disability like agoraphobia, that the RCVCO or Knock could reasonably be found to have acted in bad faith by

not anticipating this limitation here.[5]  What is in the record is that plaintiff either did not respond to Knock's attempts at communications, or he responded in an email in which he made conclusory statements that Knock may not be trained to work with individuals with PTSD.  Even assuming that Knock learned about the February 2015 visit that Marx could not complete, there is no evidence that Marx (or his wife) actually informed anyone at the RCVSO that he could not appear for an in-person visit *because of* his PTSD, nor that his PTSD precluded an in-person visit in his home.  Construing the evidence of record in plaintiff's favor, perhaps plaintiff's particular circumstances made it very difficult for him for convey this message, but it appears that plaintiff *could* advocate for himself, or at the very least, that his wife could communicate his need for a special accommodation for him.

Even assuming that the trier of fact could reasonably find that Marx (or his wife) *did* effectively convey that he needed an exception to this rule because of his PTSD, or at least that Knock should have intuited this need, there is a second, more fundamental hurdle that plaintiff cannot clear:  the only evidence of record shows that Knock was making efforts to accommodate him, while a reasonable trier of fact would have to find that *plaintiff* refused to work with her.  In May of 2015, the undisputed evidence is that Knock called Marx, told him that she would attempt to work with him and assured him that she would not judge his prior behavior.  Then in July, even though plaintiff criticized her approach, Knock continued to request information from him, telling him again that all he had to do was come to the office.  Even though plaintiff contends that Knock had not yet offered to visit his house at that point, there is no evidence suggesting that plaintiff or anyone else asked for that accommodation.  Moreover, while plaintiff claims that Knock

---

[5] This is not to say that as a matter of *policy*, the RCVCO could not have better anticipated this need by at least providing a written form allowing someone seeking benefits to indicate if some accommodation to the in-person meeting requirement is necessary.

harassed and intimidated him in her efforts to persuade him to come into the office, those conclusory accusations are not supported by any evidence of record.

Instead, the records reflects that Knock's communications to plaintiff, while not always polite -- in one email she disagreed with his complaint about the availability of her contact information -- repeatedly expressed an interest in helping him if only he agreed to an in-person meeting. Furthermore, Knock followed up with him with informational emails, in an apparent effort to provide him tools that the RCVSO was providing to other veterans. Later, in November of 2015 and then May of 2016, when plaintiff was no longer willing to communicate with Knock, Knock attempted to convey in her communication with the VA that she was willing to come to his house to meet with him. Perhaps Knock could be faulted for not anticipating that an in-person meeting *in the office* was the impediment for Marx and not making the home visit offer *directly* to him earlier, whether orally or in writing, but plaintiff also took no steps to acknowledge that Knock made the home visit offer, much less to communicate whether Knock's proposal would adequately address his concern that a visit to the office would trigger his PTSD. In the end, even accepting that Knock should have construed plaintiff's behavior as a request for a reasonable accommodation, it was *plaintiff* who failed to engage with Knock to provide her with the information she would need to determine how best to provide him benefits while also ensuring that she could verify his identity. Indeed, even in 2016, when Marx learned (at the latest) that Knock was willing to conduct a home visit, the evidence is that Marx failed to follow up. Therefore, on this record, a fact finder could not conclude that defendant failed to reasonably accommodate plaintiff's disability. Of course, this does not mean that defendant is relieved of its obligation to consider plaintiff's request should he now avail himself of RCVSO's offers to reasonably accommodate his special needs in completing his application for benefits.

## C.    Disparate impact

Finally, plaintiff argues under a theory of disparate impact that the in-person meeting requirement discriminates against veterans with debilitating PTSD, citing to *Alexander v. Choate*, 469 U.S. 287 (1985).  To state a claim for discrimination under a disparate impact theory, however, plaintiff had to offer *some* objective evidence showing that the in-person meeting policy caused a "relevant and statistically significant disparity" between veterans with PTSD and non-disabled veterans.  *See Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014)).  Plaintiff has offered no proof, or even alluded to *any* other instances in which the RCVSO insisted that a veteran with PTSD triggers meet in person in its offices, despite an inability to do so, much less been denied benefits.  On the contrary, he acknowledged during his deposition that he did not have any other examples of veterans with PTSD who lost benefits as a result of Knock's policy.  As such, plaintiff cannot succeed on a disparate impact theory either, and judgment in defendant's favor is appropriate.

## II.    Federal assistance

Defendant's alternative argument as to his Rehabilitation Act claim is that it cannot be held liable because the program in question -- the RCVSO -- does not receive federal financial assistance.  As previously noted, to establish a violation of the Rehabilitation Act, plaintiff must prove that the RVCSO receives federal financial assistance.  *Grzan v. Charter Hosp. of N.W. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997).  In *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986), the Supreme Court addressed "who could and who could not be held liable as [a] recipient of federal funds under Section 504."  *Grzan*, 104 F.3d at 119-20.  The Supreme Court explained that "Congress limited coverage under the Rehabilitation Act to those who

actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept federal funds." *Grzan*, 104 F.3d at 120 (quoting *Paralyzed Veterans*, 477 U.S. at 605). Therefore, liability under the Rehabilitation Act ends with the entity that *directly* receives the federal funds because "coverage of the Rehabilitation Act does not follow federal aid past the intended recipients to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." *Id.*; *Maxwell v. South Bend Work Release Ctr.*, 787 F. Supp. 2d 819, 827-28 (N.D. Ind. 2011) (concluding that private company does not receives federal financial assistance even though it participates in a joint venture with the Indiana Department of Corrections).

In support of its argument, defendant points to Wis. Stat. § 45.80(5)(e), which provides that Wisconsin county veterans services offices similar to the RCVSO operate "separately and distinctly from any other county department." While plaintiff responds that the RCVSO applied for and received the 2015 CVSO grant of $8,500 from the Wisconsin DVA, further claiming that the source of ten percent of that grant money comes from the Wisconsin Veterans Home, which are funded in part by federal assistance. However, plaintiff has no evidence supporting a finding that the RCVSO receives *direct* federal funding. Even accepting as true that a portion of the 2015 grant received by the RCVSO can be traced back to federal funds because the home receives Medicare reimbursements, that connection to federal funding is likely too attenuated to support a finding that RCVSO accepts federal funds. Far less obvious is whether a state statute purporting to require county veterans services offices to operate "separately and distinctly" from other county *departments* somehow insulated *the County's* possible liability under the RCVSO as the named defendant, since the County departments are still not separate legal entities and the County surely does receive direct federal funding. *See Schroder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir.

1991) ("if the office of a mayor received federal assistance and distributes it to local departments or agencies, all of the operations of the Mayor's office are covered along with the departments or agencies which actually get the aid")  Since the defendant is not liable under the ADA for reasons already discussed, however, the court need not decide this issue.


ORDER

IT IS ORDERED that:

1.  Plaintiff Robert Marx's motion for reconsideration (dkt. #19) is DENIED.

2.  Defendant Richland County's motion for summary judgment (dkt. #20) is GRANTED.

3.  The clerk of court is DIRECTED to enter judgment in defendant's favor and close this case.

Entered this 20th day of July, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge